AUTO-OWNERS INSURANCE COMPANY v SEILS

SEILS v PINK

Docket Nos. 315891, 315901, and 316511. Submitted October 15, 2014,
at Detroit. Decided March 26, 2015, at 9:15 a.m. Leave to appeal
sought.

    Chad Seils, as personal representative of the estates of Carrie M.
Seils (his ex-wife) and Skyler Seils (their daughter) and as next
friend of their other daughter, Heavyn Seils, brought an action
in the Wayne Circuit Court against Todd Pink (Pink); Richard
Pink; the Fraternal Order of Police Associates, Grosse Pointe
Lodge 102 (FOPA); and Olympia Entertainment, Inc. Seils
alleged that after drinking heavily, Pink and Carrie attended
the 2010 Hoedown festival in Detroit. Pink, who was visibly
intoxicated, then consumed more beer purchased from festival
vendors, including FOPA, which as a nonprofit charitable orga-
nization that was engaged in fundraising had entered into a
concession agreement with Olympia for the event and had a
temporary license from the Liquor Control Commission for a
beer tent. Later in the day, Pink returned to Carrie's residence
and killed her and Skyler and seriously injured Heavyn. Seils
alleged that FOPA's sale of alcohol to Pink while he was visibly
intoxicated violated the dramshop act, MCL 418.1801. FOPA
and Olympia separately sought summary disposition. The court,
Robert J. Ziolkowski, J., denied both motions, and FOPA and
Olympia were separately granted leave to appeal in Docket Nos.
315901 and 316511.

    Auto-Owners Insurance Company brought a declaratory judgment
action in the Wayne Circuit Court against Olympia, FOPA, and
Seils. FOPA's concession agreement with Olympia required
FOPA to obtain comprehensive general-liability insurance,
workers' compensation coverage, and host liquor-liability insur-
ance that included Olympia as an additional named insured.
It also required FOPA to indemnify Olympia with respect to claims
arising out of FOPA's performance of the agreement. FOPA did
not obtain liquor-liability insurance. The commercial general-
liability policy that Auto-Owners issued to FOPA expressly ex-
cluded coverage for liquor liability, but the exclusion applied only

if the insured was in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages. The policy also excluded coverage for contractual liability, but the exclusion did not apply to liability for certain damages assumed in an insured contract pertaining to the insured's business under which the insured assumed the tort liability of another party to pay for bodily injury or property damage to a third person or organization. The court, Robert L. Ziolkowski, J., ruled that the general-liability policy Auto-Owners had issued to FOPA provided both dramshop and contractual-liability coverage for the incident involving Pink. The court held that FOPA was not in the business of selling, serving, or furnishing alcoholic beverages, so the policy's liquor-liability exclusion did not apply. The court also ruled that the concession agreement pertained to FOPA's fund-raising for its business of civic and charitable activities and that the contractual liability exclusion of the policy therefore did not apply. Accordingly, the court entered an order that denied Auto-Owners' motion for summary disposition, granted summary disposition to FOPA, required Auto-Owners to defend and indemnify FOPA in the underlying dramshop action, and required Auto-Owners to defend and indemnity Olympia. Auto-Owners appealed in Docket No. 315891, and the Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. Because the commercial general-liability policy in this case did not exclude all coverage for liquor liability and contractual liability and because under the facts and circumstances of this case the exceptions to the exclusions arguably apply, the trial court did not err by strictly construing the exclusions in favor of coverage. Insurance policy exclusions must be strictly construed against the insurer and in favor of coverage. The insurance policy in this case was sold to a nonprofit group whose primary purpose and activities were charitable and civic. But FOPA also engaged in limited annual fundraising through alcohol sales permitted under a temporary license. Its sale of alcoholic beverages was not part of a permanent and ongoing commercial venture. Accordingly, the trial court did not err by ruling that FOPA was not in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages and did not abuse its discretion by ruling that the exception to the liquor-liability exclusion applied and that the policy provided coverage for Seils's dramshop action.

2. With respect to the contractual-liability exclusion, the trial court also properly rejected Auto-Owners' argument that the term "business" must be construed consistently throughout the policy.

Rather, the word "business" must be construed in context and read in light of the contract as a whole, and a clearly different context surrounds the term "business" in the contractual-liability exclusion than in the exception to the liquor-liability exclusion. The contractual-liability exclusion did not apply to an insured contract, that is, a contract pertaining to FOPA's business. The trial court correctly ruled that FOPA was not in the business of selling alcoholic beverages as described in the exception to the liquor-liability exclusion, but the concession agreement pertained or related to FOPA's business because it related to FOPA's fundraising activities for its business of civic and charitable activities. Therefore, the trial court correctly ruled that the exception to the contractual-liability provision applied because the concession agreement pertained to FOPA's business.

3. The trial court erred by not granting summary disposition to FOPA and Olympia. To establish his dramshop action, Seils had to show that FOPA violated MCL 436.1801(2) by selling, furnishing, or giving alcohol to Pink while he was visibly intoxicated. MCL 436.1801(3) imposes liability on a liquor licensee whose unlawful sale or furnishing of alcoholic liquor to a minor or visibly intoxicated person caused or contributed to the intoxication that was a proximate cause of damage, injury, or death. A dramshop action may be premised on an allegedly intoxicated person's assaultive criminal conduct, but there still must be sufficient evidence that furnishing the alcohol to the person was a proximate cause of the violent behavior. Proof of proximate cause requires establishing two elements: (1) cause in fact and (2) legal cause or proximate cause. Cause in fact requires that the harmful result would not have come about but for the defendant's conduct. A plaintiff must adequately establish cause in fact in order for legal cause or proximate cause to become a relevant issue. Whether proximate cause or legal cause is established normally requires examining the foreseeability of the consequences and whether the defendant should be held legally responsible for those consequences. The chain of causation between the defendant's conduct and the plaintiff's injuries can be broken by an intervening or a superseding cause, which is one that actively operates in producing harm to another after the original actor committed the negligent act or omission. An intervening cause breaks the chain of causation and constitutes a superseding cause that relieves the original actor of liability unless the intervening act was reasonably foreseeable. Accordingly, the issue of proximate causation requires focusing on whether the result of conduct that created a risk of harm and any intervening causes were foreseeable. In general, invitors have a duty to respond

reasonably to situations occurring on their premises that pose a risk of imminent and foreseeable harm to identifiable invitees, but they have no duty to otherwise anticipate and prevent the criminal acts of third parties. Both the question of duty and proximate cause depend in part on foreseeability. Criminal acts by third parties can be foreseeable. Seils, however, identified no evidence from which FOPA could have reasonably foreseen Pink's intentional criminal acts, and Pink's decision to commit murder and other assaults was an intervening or superseding cause of the injuries Seils alleged.

4. The dramshop act does not permit imposition of liability on a third party under a common-law theory of vicarious liability in which the third party is the principal and the liquor licensee the agent. Under MCL 436.1801(2), the only vicarious liability that exists is for liability flowing upward to the licensee from its clerk, agent, or servant who actually sells, furnishes, or gives alcoholic liquor to a person who is visibly intoxicated. MCL 436.1801(10) provides that the dramshop act is the exclusive remedy for money damages against a licensee arising out of the selling, giving, or furnishing of alcoholic liquor to a minor or intoxicated person. Consequently, because Olympia was not the liquor licensee in this case, its lack of vicarious liability provided an alternative basis for reversal.

5. MCL 436.1801(4) requires that a plaintiff give written notice of a dramshop action to all defendants within 120 days after entering an attorney-client relationship for the purpose of pursuing a dramshop claim. Failure to give written notice within the time specified is grounds for dismissal of the claim with respect to any defendants that did not receive notice unless sufficient information for determining that a retail licensee might be liable under that section was not known and could not reasonably have been known within the 120 days. Seils's attorney sent a letter to FOPA stating that he intended to pursue a dramshop claim against it. Approximately two months later, he sent a letter to Olympia that contained a courtesy copy of the letter to FOPA but did not assert a claim under MCL 436.1801 against Olympia. This courtesy copy notice of Seils's intent to pursue a dramshop claim against FOPA could not, by its plain terms, be read as notice of a dramshop claim against Olympia. Seils's failure to give Olympia the timely written notice required by MCL 436.1801(4) provided another alternative basis for reversal.

Affirmed in Docket No. 315891.

Reversed in Docket Nos. 315901 and 316511 and remanded to trial court for entry of orders granting summary disposition to FOPA and Olympia.

*Willingham & Coté, P.C.* (by *Kimberlee A. Hillock, John A. Yeager,* and *Frederick M. Baker*), for Auto-Owners Insurance Company.

*Peter J. Parks* for Chad Seils.

*Cummings, McClorey, Davis & Acho, P.L.C.* (by *Douglas J. Curlew*), for Olympia Entertainment, Inc., in Docket No. 315891.

*Cummings, McClorey, Davis & Acho, P.L.C.* (by *T. Joseph Seward* and *Lindsey J. Kaczmarek*), for Olympia Entertainment, Inc., in Docket No. 316511.

*David Franks, P.C.* (by *David J. Franks*), for Fraternal Order of Police Associates, Grosse Pointe Lodge 102 in Docket No. 315891.

*Secrest Wardle* (by *Drew W. Broaddus* and *Thomas J. Azoni*) for Fraternal Order of Police Associates, Grosse Pointe Lodge 102 in Docket No. 315901.

Before: BOONSTRA, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM. These cases are consolidated for purposes of appeal. In Docket No. 315891, Auto-Owners Insurance Company appeals by right the trial court's declaratory ruling that the commercial general-liability policy (CGL) it issued to defendant Fraternal Order of Police Associates, Grosse Pointe Lodge 102 (FOPA) provided both dramshop and contractual-liability coverage for an incident in which an allegedly intoxicated person (AIP) murdered and severely in-

jured several people. In Docket No. 315901, this Court granted the FOPA's application for leave to appeal the trial court's denial of its motion for summary disposition of the underlying dramshop action. Similarly, in Docket No. 316511, defendant Olympia Entertainment, Inc., appeals by leave granted the trial court's denial of its motion for summary disposition with respect to the same dramshop action. For the reasons discussed in this opinion, we conclude that the trial court did not err in its ruling in Docket No. 315891 but that in Docket No. 315901 and Docket No. 316511 it should have granted summary disposition to those defendants regarding the dramshop action because the plaintiff in that case, Chad Seils, cannot establish proximate cause. MCL 436.1801(2) and (3).

I. SUMMARY OF PERTINENT FACTS AND PROCEEDINGS

A. DOCKET NO. 315891

According to the testimony of Robert Estabrook, its treasurer and one of its incorporators, the FOPA is a nonprofit corporation organized for the purpose of supporting the police and various charities such as Special Olympics and other community charities. The FOPA also directly supports local police by doing things like buying GPS units for detectives' cars and bulletproof vests for new officers. Its articles of incorporation as a domestic nonprofit corporation state that in addition to "inculcat[ing] loyalty and allegiance" to the Constitution and the nation, the FOPA's purpose is to "join together fraternally . . . to promote and foster the impartial enforcement of law and order; to assist in all reasonable and ethical ways our parent lodge, Fraternal Order of Police, Grosse Pointe Lodge No. 102, in their endeavor to support and assist their members and family . . . ."

To raise money for its stated purposes, the FOPA would each year obtain a temporary license from the Liquor Control Commission to staff a beer tent at various community special events and, in particular, staff a beer tent at an annual three-day event known as the Detroit Hoedown (the Hoedown). It is undisputed that this event had been the FOPA's main fundraiser for 20 years preceding the events of May 2010. CBS Radio and Live Nation Entertainment promoted the Hoedown, and concessions were run by a succession of event managers, ending in 2010 with Olympia. For the 2010 Hoedown, Olympia and the FOPA entered into a concession agreement. Twelve other civic groups also signed concession agreements as "sub-licensees" to staff beer tents at the Hoedown under the auspices of the FOPA's special liquor license. Estabrook testified that Olympia recruited, trained, and supervised the other civic groups and that the FOPA was responsible for only one beer tent. The FOPA earned $8,010.19 from the 2010 Hoedown, representing an 8% commission on gross sales from the beer tent it staffed; gross beer sales at the entire event were $875,351.70. The other civic groups likewise received an 8% commission on gross sales from the beer tent the civic group staffed.

The concession agreement required the FOPA to obtain and certify to Olympia that it had obtained "(i) comprehensive general liability insurance . . . ; (ii) required worker's compensation coverage; and (iii) host liquor liability insurance of not less than $500,000 for each occurrence." Also, these insurance policies were to include Olympia, CBS Radio, Live Nation, the Hoedown, and the city of Detroit as additional named insured parties. The FOPA did not obtain liquor-liability insurance.

The concession agreement also contained an indemnification clause providing that "[i]rrespective of the amount of insurance provided, [the FOPA] shall be liable for and shall indemnify, defend and hold harmless [Olympia] . . . against and with respect to any claim, liability, obligation, loss, damage, assessment, judgment, cost and expense . . . arising out of or as result of or related to" the FOPA's performance of the agreement.

The issues presented in this appeal concern the application of two exclusions in the CGL policy that Auto-Owners issued to the FOPA. The "Tailored Protection Policy" identifies the insured on its face page as "FOP LODGE #102" and as a "Club" that is "Not For Profit." The policy both excluded and provided coverage for liquor liability by providing the following in § I(A)(2)(c) under "Exclusions":

This Insurance does not apply to:

\* \* \*

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only *if you are in the business of* manufacturing, distributing, *selling, serving or furnishing alcoholic beverages.* [Emphasis added.]

The policy also both excluded and provided coverage for contractual liability by providing in § I(A)(2)(b) under "Exclusions" that the insurance also did not apply to the following:

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. However, if the insurance under this policy does not apply to the liability of the insured, it also does not apply to such liability assumed by the insured under an "insured contract".

The meaning of "insured contract" pertinent to this case is found in § V(10) of the policy setting forth various definitions. The parties agree that it means:

That part of *any other contract or agreement pertaining to your business* . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. [Emphasis added.]

At an April 1, 2013 hearing on the parties' motions for summary disposition, the trial court ruled with respect to § I(A)(2)(c) of the policy that the FOPA was not "in the business of . . . selling, serving or furnishing alcoholic beverages." Therefore, the liquor-liability exclusion of the CGL policy did not apply. The trial court first noted that "business" was undefined and opined that

if it's defined as purposeful activity, then the exclusion might apply.

But if we look at other definitions in the business, where we talk about on -- ongoing commercial activity to provide a livelihood to a person, in this case an organization, then it wouldn't apply.

The court also found pertinent a distinction found in some cases of "a single activity or a single incident versus a continuous activity," which favored the FOPA. The court then ruled that the FOPA was not in the business of selling, serving or furnishing alcoholic beverages.

The trial court rejected Auto-Owners' contention that if the FOPA is not in the business of selling alcohol, and the contract between the FOPA and Olympia concerned selling alcohol, then the concession agreement could not be an insured contract because it did not pertain to the FOPA's business. The trial court ruled that the policy definition of "insured contract"— i.e., "pertaining to your business"—was broader than the language "in the business" as used in the liquor-liability exclusion. On this basis, the trial court ruled that the concession agreement pertained to the FOPA's fundraising for its business of civic and charitable activities. Therefore, the contractual-liability exclusion of Auto-Owners' CGL policy did not apply.

For these reasons, the trial court entered an order on April 17, 2013, denying Auto-Owners' motion for summary disposition and granting summary disposition to the FOPA. This order required Auto-Owners to defend and indemnify the FOPA in the underlying dramshop action. On the basis of its ruling on the contractual-liability exclusion, the trial court also ordered that Auto-Owners defend and indemnify Olympia because the concession agreement between

the FOPA and Olympia regarding the staffing of beer tents at the three-day Hoedown was an "insured contract."

Plaintiff Chad Seils (Seils) is the ex-husband of decedent Carrie Marie Seils and the father of their children, decedent Skyler Seils and Heavyn Seils.[1] On May 15, 2010, Carrie and Skyler were killed at their home in Clinton Township by a man whom Carrie had been dating, defendant Todd Michael Pink (Pink). Pink also shot Carrie's roommate, James Pagano, and seriously injured Heavyn. Following a jury trial in April 2011, Pink was convicted of two counts of first-degree premeditated murder, two counts of felony murder, two counts of assault with intent to murder, four counts of possession of a firearm during the commission of a felony, one count of first-degree home invasion, one count of assaulting or resisting a police officer, and one count of being a felon in possession of a firearm. This Court affirmed Pink's convictions and sentences but remanded for the correction of the judgment of sentence.[2]

On August 31, 2011, Seils, as personal representative of the estates of Carrie and Skyler and as next friend of Heavyn, sued the FOPA, Olympia, Pink, and Pink's father, Richard Pink.[3] In relevant part, the first amended complaint alleged that on the evening of Friday, May 14, 2010, and throughout the day on Saturday, May 15, 2010, Pink and Carrie "were en-

---

[1] At the time, Skyler was three, and Heavyn was five years old.

[2] *People v Pink*, unpublished opinion per curiam of the Court of Appeals, issued August 28, 2012 (Docket No. 304909).

[3] The register of actions indicates that the trial court dismissed Richard Pink on June 28, 2013.

gaged in a joint alcohol drinking binge" and that by mid-afternoon, Pink was visibly intoxicated. In the afternoon, Pagano, Pink, and Carrie decided to attend the Hoedown at Hart Plaza. Pagano drove, and Carrie's children went along with the three adults. Seils alleged that Pink purchased and consumed "several beers" from the beer vendors shortly after arriving at the festival, that Pink's behavior became increasingly disruptive and aggressive from his increasing intoxication, and that "he precipitated several near violent confrontations with festival attendees." Pagano and Carrie decided they should leave the festival to "avoid a brawl from erupting" and insisted that Pink "accompany them before he got himself arrested." During the drive home, Pink and Carrie engaged in an argument about leaving the festival. Upon arriving at the residence in Clinton Township, Pink drove off in his car and went to the mobile home where his father lived and retrieved a loaded handgun. Upon returning to the Clinton Township residence, Pink kicked in the door, shot Pagano in the head, and then fatally shot Carrie. Pink aimed the gun at Heavyn, but the gun jammed and did not discharge. Pink then chased the children into the kitchen, grabbed a large knife and fork, and stabbed the children multiple times.

In relevant part, the amended complaint alleged that the FOPA was granted a special license by the Liquor Control Commission to serve intoxicating beverages at the festival, that the FOPA sold alcoholic beverages to Pink, who the FOPA knew or should have known was visibly intoxicated in violation of MCL 436.22,[4] and that the furnishing of alcoholic beverages

---

[4] MCL 436.22 was the predecessor of the current applicable statute, MCL 436.1801, which has been in effect since April 14, 1998. MCL 436.1801 is commonly referred to as the dramshop act.

"caused and/or contributed to the horrific violent crimes" Pink committed while he was severely intoxicated.

In Docket No. 315901, the FOPA appeals by leave granted the trial court's separate April 17, 2013 order denying its motion for summary disposition of Seils's dramshop action on the basis that the actions of Pink in committing first-degree premeditated murder and assault with intent to murder were not reasonably foreseeable such that Seils could not establish the necessary element of proximate causation. The FOPA argued that under the undisputed facts, Pink's actions were deliberate and premeditated and therefore not a foreseeable consequence of serving alcohol to a visibly intoxicated adult and that Pink's specific intent severed any causal chain with respect to any improper serving of alcohol. Olympia filed a concurrence in this aspect of the FOPA's motion below. The trial court ultimately denied the motion, relying on *Weiss v Hodge (After Remand)*, 223 Mich App 620; 567 NW2d 468 (1997) (holding that the dramshop act permits imposition of liability for intentional torts), and concluded that the issue of proximate cause was a question of fact.

In Docket No. 316511, Olympia appeals by leave granted the trial court's May 14, 2013 order denying its motion for summary disposition with respect to Seils's dramshop action. The parties argued this motion the same day as the FOPA's motion. In addition to ruling that the issue of proximate cause presented a question of fact for trial, the trial court rejected Olympia's arguments that it could not be held liable under the dramshop act because it was not the liquor licensee and because Seils had failed to provide it with written notice as required by MCL 436.1801(4).

## II. DOCKET NO. 315891

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 366; 817 NW2d 504 (2012). Summary disposition is proper if the evidence, affidavits, pleadings, and admissions viewed in a light most favorable to the other party demonstrate that there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 291; 778 NW2d 275 (2009); MCR 2.116(C)(10). A trial court's decision regarding declaratory relief is reviewed for an abuse of discretion. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 376; 836 NW2d 257 (2013).

We also review de novo the interpretation of a contract and the legal effect of one of its clauses. *Rory v Continental Ins Co*, 473 Mich 457, 461, 464; 703 NW2d 23 (2005). We construe insurance contracts in the same manner as other contracts, assigning the words in the contract their "ordinary and plain meaning if such would be apparent to a reader of the instrument." *DeFrain*, 491 Mich at 366-367 (quotation marks and citation omitted). A dictionary may be consulted to ascertain the plain and ordinary meaning of words or phrases used in the contract. *Citizens Ins Co v Pro-Seal Serv Group, Inc*, 477 Mich 75, 84; 730 NW2d 682 (2007). A "court must look at the contract as a whole and give meaning to all terms." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992). After ascertaining the meaning of a contract's terms, "a court must construe and apply unambiguous contract provisions as written." *Rory*, 473

Mich at 461. A contract is ambiguous when, after considering the entire contract, its words may reasonably be understood in different ways. *Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999). Thus, when "a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous . . . ." *Raska v Farm Bureau Mut Ins Co of Mich*, 412 Mich 355, 362; 314 NW2d 440 (1982). An ambiguous provision in an insurance contract is construed against the insurer and in favor of coverage. *Id.*; *Heniser v Frankenmuth Mut Ins Co*, 449 Mich 155, 160; 534 NW2d 502 (1995).

A two-step analysis is used when interpreting an insurance policy: first, does the general insurance policy provide coverage for the occurrence, and second, if coverage exists, does an exclusion negate the coverage? *Hunt v Drielick*, 496 Mich 366, 373; 852 NW2d 562 (2014). "It is the insured's burden to establish that his claim falls within the terms of the policy." *Heniser*, 449 Mich at 172. In this case, the parties do not seriously dispute that if the exclusions at issue do not apply, Auto-Owners' claims come within the general terms of the CGL policy that Auto-Owners issued to the FOPA and also that the general terms of the policy cover the contractual liability of the FOPA to Olympia under the concession agreement. The insurance company has the burden to prove that one of the policy's exclusions applies. *Id.* at 161 n 6; *Dells*, 301 Mich App at 378. "Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Churchman*, 440 Mich at 567. But clear and specific exclusions will be enforced as written so that the insurance company

is not held liable for a risk it did not assume. *Id.*; *Group Ins Co of Mich v Czopek*, 440 Mich 590, 597; 489 NW2d 444 (1992).

B. ANALYSIS

Auto-Owners argues that the trial court erred by ruling that the insurance policy's liquor-liability exclusion did not apply on the facts of this case because the FOPA was "in the business of . . . selling, serving, or furnishing alcoholic beverages." Furthermore, Auto-Owners contends that if the FOPA was not in the business of selling alcoholic beverages, for purposes of avoiding the liquor-liability exclusion, then the concession agreement cannot pertain to the FOPA's business because it was totally about the sale of alcohol and, therefore, coverage for Olympia is excluded. We conclude that because the policy in this case did not exclude *all* coverage for liquor liability and contractual liability and because under the facts and circumstances of this case the exceptions to the exclusions arguably apply, the trial court did not err by strictly construing the exclusions at issue in favor of coverage. *Churchman*, 440 Mich at 567. Moreover, in light of foreign caselaw interpreting liquor-liability exclusions analogous to that at issue,[5] a fair reading of the policy as a whole could lead to opposite conclusions regarding coverage; therefore, the policy "should be construed against its drafter and in favor of coverage." *Raska*, 412 Mich at 362.

The Auto-Owners policy does not define the key word "business" or the critical phrases "in the business

---

[5] Cases from other jurisdictions are not binding precedent, but we may consider them to the extent this Court finds their legal reasoning persuasive. *Hiner v Mojica*, 271 Mich App 604, 612; 722 NW2d 914 (2006).

of" and "pertaining to your business." Consequently, when determining the plain and ordinary meaning of these words and phrases it is appropriate to consult a dictionary. *Safety King*, 286 Mich App at 294. Further, contractual terms must be construed in context, *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 516; 773 NW2d 758 (2009), and read in light of the contract as a whole, *Churchman*, 440 Mich at 566.

In *Random House Webster's College Dictionary* (1992), "business" is defined as

> **1.** an occupation, profession, or trade. **2.** the purchase and sale of goods in an attempt to make a profit. **3.** a person, partnership, or corporation engaged in commerce, manufacturing, or a service. **4.** volume of trade; patronage or custom. **5.** a store, office, factory, etc., where commerce is carried on. **6.** that with which a person is principally and seriously concerned: *Words are a writer's business.*

*The American Heritage Dictionary, Second College Edition* (1985), similarly defines the word "business" as

> **1. a.** The occupation, work, or trade in which a person is engaged: *in the wholesale food business.* **b.** A specific occupation or pursuit: *really knew her business.* **2.** Commercial, industrial, or professional dealings: *new systems now being used in business.* **3.** A commercial enterprise or establishment: *bought his uncle's business.*

And *Black's Law Dictionary* (10th ed) defines "business" as

> **1.** A commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain. . . . **2.** Commercial enterprises <business and academia often have congruent aims>. **3.** Commercial transactions <the company has never done business in Louisiana>.

While these dictionary definitions support Auto-Owners' argument that "business" could mean any

"occupation, profession, or trade," nothing in the wording of the exception to the liquor-liability exclusion or the rest of the policy supports its argument that the exception is intended to apply only to furnishing alcoholic beverages in a social-host setting. Also, contrary to Auto-Owners' argument that the focus of the exception is on the activity of the insured at the time of the occurrence, the wording of the exception, "if *you* are in the business of . . . selling, serving or furnishing alcoholic beverages," places emphasis on the defining aspect of the insured.[6] Auto-Owners could have, but did not, place the focus of the liquor-liability exclusion on the nature of the activity giving rise to the claim, as did the policies at issue in some of the out-of-state cases the parties cite, such as *McGriff v US Fire Ins Co*, 436 NW2d 859, 861-862 (SD, 1989), and *Fraternal Order of Eagles v Gen Accident Ins Co of America*, 58 Wash App 243, 246; 792 P2d 178 (1990), both involving the Fraternal Order of Eagles. In each of these cases, the liquor-liability exclusion applied when the insured "organization *engaged in the business of* . . . selling or serving alcoholic beverages . . . ." *Fraternal Order of Eagles*, 58 Wash App at 246 (emphasis added); see also *McGriff*, 436 NW2d at 861. Thus, the exclusion focused on "the *specific conduct* for which liability is alleged, not on the general nature of the organization." *Fraternal Order of Eagles*, 58 Wash App at 250. In each case, the court held that the exclusion applied when the Eagles organization operated a bar on an ongoing basis

---

[6] Cf. *Cormier v Travelers Ins Co*, 618 So 2d 1185, 1187 (La App, 1993) (opining on an exception to a liquor-liability exclusion identically worded to that in the present case and stating that "[t]he obvious purpose of the phrase 'in the business of' is to describe the nature of the activity engaged in and has nothing to do with the specific purpose for which the activity is pursued or the nature of the person or entity engaged in the activity").

for a profit, which provided benefits to its members and supported its operations. *Id.* at 248-249; *McGriff*, 436 NW2d at 862-863.

But even in cases in which the liquor-liability exclusion applied when an organization was engaged in the business of selling or serving alcoholic beverages, courts have read the word "business" as limiting its application. One court noted that if the insurance company had "clearly intended to exclude coverage for any activity involving the sale or serving of liquor, clear language to that effect could have been employed, and any reference to 'business' would have been unnecessary." *Schenectady Co v Travelers Ins Co*, 48 AD2d 299, 302; 368 NYS2d 894 (1975). Hence, the word "business" limited the application of the exclusion. *Id.* The court determined that the exclusion would apply to regular activity for pecuniary gain, i.e., an ongoing venture of selling or serving alcohol, but that it would not apply when the sale of alcohol occurs infrequently and the risk of dramshop liability would accordingly be limited. *Id.* at 301-302. This reading of the exclusion is consistent with dictionary definitions and the wording of the exception to the liquor-liability exclusion at issue in this case.

Other courts interpreting the same language as that at issue in this case have similarly found pertinent whether the nonprofit group engaged in alcohol sales on a continuous, ongoing basis. So when a group regularly operates a bar selling alcohol to members and the public, courts have held that the exception to a liquor-liability exclusion did not apply because the insured was "in the business of . . . selling, serving or furnishing alcoholic beverages." In *Auto-Owners (Mut) Ins Co v Sugar Creek Mem Post 3976*, 123 SW3d 183, 189-190 (Mo App, 2003), citing dictionary definitions

and quoting *Sprangers v Greatway Ins Co*, 182 Wis 2d 521, 540; 514 NW2d 1 (1994), the court opined that the relevant inquiry was the nature of the insured's activities and that "a court must determine whether the insured 'consistently engages in an activity which creates a level of risk which the insurer has declared unacceptable.' " The Missouri court concluded that the VFW post that operated a bar open to the public "exposed its insurer to the same risks inherent in other drinking establishments operated by for-profit entities." *Id.* at 189. Similar cases finding a liquor-liability exclusion, with an exception worded exactly like that in the present case, applied on the basis of regular alcohol sales include *Nichols v Westfield Ins, Co*, 235 Ga App 239, 241-242; 509 SE2d 149 (1998) (holding that the exclusion applied when a veterans' group operated a bar that regularly sold alcohol to the public, which was a primary source of the group's income), and *US Fidelity & Guaranty Co v Country Club of Johnston Co, Inc*, 119 NC App 365, 372; 458 SE2d 734 (1995) (holding that the country club was "in the business of . . . selling, serving or furnishing alcoholic beverages" when it did so in "an ongoing operation rather than an occasional or infrequent event"). In general, these cases focused on the nature of the risk created by ongoing alcohol sales rather than the corporate nonprofit character of the organization. See *Nichols*, 235 Ga App at 241 (stating that the focus is on "the nature of risks resulting from the insured's *activities*, not from its fraternal *purposes*"); *Johnston Co Country Club*, 119 NC App at 372 (stating that "it is irrelevant whether the insured is a nonprofit organization" when the sale of alcoholic beverages is "a permanent, ongoing operation").

A case from another jurisdiction with facts most similar to the facts of the instant case, and that

construes the same policy language, is *Mut Serv Cas Ins Co v Wilson Twp*, 603 NW2d 151 (Minn App, 1999). In that case, the township and its fire department annually held a one-day fundraiser at which beer was sold under a temporary license. *Id.* at 152. A patron at the event became obviously intoxicated and later was in an automobile accident. At issue was whether the township's general-liability policy, with a liquor-liability exclusion identically worded to that in the instant case, provided coverage for the dramshop action filed by the injured party. *Id.* at 152-153. On the basis of dictionary definitions, the court found the phrase "in the business of" to be "commonly understood to refer to a commercial enterprise or activity." *Id.* at 153-154. The court held that the exclusion did not apply to the township's commercial general-liability policy because "the insured was a nonprofit organization that did not sell alcoholic beverages as part of a permanent and ongoing commercial venture . . . ." *Id.* at 155.

Because the insurance policy in this case was sold to a nonprofit group whose primary purpose and activities were charitable and civic but which also engaged in limited annual fundraising through alcohol sales permitted under a temporary license, we conclude that the trial court did not err by ruling that the FOPA was not "in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages." Consequently, the trial court did not abuse its discretion by ruling that the exception to the liquor-liability exclusion applied and that the policy provided coverage for Seils's dramshop action. Our conclusion is buttressed by the principle that insurance policy exclusions must be strictly construed against the insurer and in favor of coverage. *Hunt*, 496 Mich at 373; *Czopek*, 440 Mich at 597. Finally, even if a fair reading

of the policy as a whole and applied to the facts and circumstances of this case could lead to opposite and reasonable conclusions regarding coverage, such a tie goes against the insurer and in favor of the insured. *Raska*, 412 Mich at 362.

We also conclude that the trial court properly rejected Auto-Owners' argument that the term "business" must be construed consistently throughout the contract. Rather, the word "business" must be construed in context and read in light of the contract as a whole. See *Churchman*, 440 Mich at 566; *Vushaj*, 284 Mich App at 515-516. A clearly different context surrounds the term "business" in the contractual-liability exclusion—the definition of "insured contract"—than in the exception to the liquor-liability exclusion. An "insured contract," by policy definition, is one "pertaining to your [the FOPA's] business." The word "pertain" broadly means "[t]o have reference; relate[.]" *Random House Webster's College Dictionary* (1992).

Thus, the trial court correctly ruled that the FOPA was not "in the business of" selling alcoholic beverages as stated in the exception to the liquor-liability exclusion. But at the same time, the concession agreement "pertained" or related to the FOPA's business because it related to the FOPA's fundraising activities for its "business" of civic and charitable activities. So, in this context, the word "business" can fairly be read as "occupation, profession, or trade," *Random House Webster's College Dictionary* (1992), or "specific occupation or pursuit," *The American Heritage Dictionary, Second College Edition* (1985). Fundraising was necessary for the FOPA's "business" or "pursuit" of charitable and civic activities, and the concession agreement clearly related to or pertained to the FOPA's "business" or "pursuit" of charitable and civic activities. Thus, the

trial court correctly ruled that the exception to the contractual-liability exclusion applied because the concession agreement "pertain[ed] to [the FOPA's] business."

Moreover, as with the liquor-liability exclusion, the contractual-liability exclusion must be strictly construed against the insurer and in favor of coverage. *Churchman*, 440 Mich at 567; *Czopek*, 440 Mich at 597. We therefore affirm the trial court's declaratory ruling regarding insurance coverage: both the liquor-liability exclusion and the contractual-liability exclusion do not apply on the facts of this case.

III. DOCKET NOS. 315901 AND 316511: PROXIMATE CAUSE

A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Under MCR 2.116(C)(10), the moving party must specifically identify the issues for which no factual dispute exists and must support this claim with evidence such as affidavits, depositions, admissions, or other documents. MCR 2.116(G)(4); *Coblentz v City of Novi*, 475 Mich 558, 569; 719 NW2d 73 (2006). If the moving party meets its initial burden, the opposing party then has the burden of showing with evidentiary materials the substance of which would be admissible that a genuine issue of disputed material fact exists. MCR 2.116(G)(4) and (6). "The adverse party may not rest upon mere allegations or denials of a pleading, but must, by affidavits or other appropriate means, set forth specific facts to show that there is a genuine issue for trial." *Patterson v Kleiman*, 447 Mich 429, 432; 526 NW2d 879 (1994).

The trial court in deciding the motion must view the substantively admissible evidence submitted up to the time of the motion in a light most favorable to the party opposing the motion. *Maiden v Rozwood*, 461 Mich 109, 120-121; 597 NW2d 817 (1999). The trial court must consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence submitted in a light most favorable to the nonmoving party to decide whether a genuine issue of material fact exists. *Id.* at 120; MCR 2.116(G)(5). Summary disposition may be granted if there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *West*, 469 Mich at 183. A genuine issue of material fact exists if the record, viewed in a light most favorable to the nonmoving party, leaves open a matter on which reasonable minds could differ. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

### B. ANALYSIS

For Seils to establish his dramshop action he must show that the FOPA violated MCL 436.1801(2) by selling, furnishing, or giving alcohol to Pink while he was visibly intoxicated and that this statutory violation was "a proximate cause of [Seils's] damage, injury, or death," MCL 436.1801(3). Because Seils points to no evidence from which the FOPA could have reasonably foreseen Pink's intentional criminal acts and because Pink's decision to commit premeditated, deliberate murder (and other assaults) was an intervening or superseding cause of Seils's damages, the trial court erred by not granting summary disposition to the FOPA and Olympia on the basis that no reasonable jury could find that the FOPA's alleged statutory violation was a proximate cause of the injury that Seils

alleged. See *Nichols v Dobler*, 253 Mich App 530, 532; 655 NW2d 787 (2002) ("Generally, proximate cause is a factual issue to be decided by the trier of fact. However, if reasonable minds could not differ regarding the proximate cause of the plaintiff's injury, the court should decide the issue as a matter of law.").

MCL 436.1801(3) "imposes liability on any licensee that, by the unlawful sale or furnishing of alcoholic liquor to a minor or visibly intoxicated person, has 'caused or contributed' to the intoxication that is a proximate cause of damage, injury, or death." *Hashem v Les Stanford Oldsmobile, Inc*, 266 Mich App 61, 74; 697 NW2d 558 (2005). Although a dramshop action may be premised on an AIP's assaultive criminal conduct, there still must be "sufficient evidence that furnishing the alcohol to the AIP is a proximate cause of the violent behavior." *Weiss*, 223 Mich App at 628-631.

In *Weiss*, this Court addressed the issue of whether a liquor licensee may be held liable in tort for an AIP's intentional physical attack on another patron, which occurred in the parking lot of the bar where the AIP had been served alcohol until 2:00 a.m. The jury found that the defendant's bartender furnished alcoholic liquor to the AIP while he was visibly intoxicated and that the furnishing of liquor to the AIP was a proximate cause of the plaintiff's injuries. On appeal, the defendant bar owner argued that while the statute contemplated liability for negligent torts, it did not create liability for intentional torts. *Id*. at 623-625. This Court analyzed the predecessor of MCL 436.1801, MCL 436.22, and noted that the statute required the sale of alcohol to be a proximate cause of the resulting injury, but did "not limit liability only to negligently inflicted injuries." *Id*. at 625-627. The *Weiss* Court

further discussed prior cases that supported this interpretation of former MCL 436.22(4). *Id.* at 628-633. The Court rejected the defendant's argument, holding that there was "clear precedent for predicating dramshop liability upon assaultive conduct of an AIP where there is sufficient evidence that furnishing the alcohol to the AIP is a proximate cause of the violent behavior." *Id.* at 630.

Proximate cause is " 'that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred . . . .' " *McMillian v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985) (citation omitted). Proof of proximate cause requires establishing two elements: (1) cause in fact and (2) legal cause or proximate cause. *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994). "Cause in fact requires that the harmful result would not have come about but for the defendant's . . . conduct." *Haliw v Sterling Hts*, 464 Mich 297, 310; 627 NW2d 581 (2001). "A plaintiff must adequately establish cause in fact in order for legal cause or 'proximate cause' to become a relevant issue." *Skinner*, 445 Mich at 163. Whether proximate cause or legal cause is established normally requires examining the foreseeability of the consequences and whether the defendant should be held legally responsible for those consequences. *Haliw*, 464 Mich at 310; *Skinner*, 445 Mich at 163; *Nichols*, 253 Mich App at 532.

As noted in the *McMillian* definition of "proximate cause," the chain of causation between the defendant's conduct and the plaintiff's injuries may be broken by an intervening or a superseding cause. An "intervening cause" is " 'one which actively operates in producing harm to another after the actor's negligent act or

omission has been committed.' " *McMillian*, 422 Mich
at 576 (citation omitted). "An intervening cause breaks
the chain of causation and constitutes a superseding
cause which relieves the original actor of liability,
unless it is found that the intervening act was 'reason-
ably foreseeable.' " *Id*. Thus, the issue of proximate
causation requires focusing on "whether the result of
conduct that created a risk of harm and any interven-
ing causes were foreseeable." *Jones v Detroit Med Ctr*,
490 Mich 960, 960 (2011).

The FOPA argues, citing *Graves v Warner Bros*, 253
Mich App 486, 493; 656 NW2d 195 (2002), that Pink's
premeditated actions of killing and injuring the vic-
tims were by their nature unforeseeable. *Graves* con-
cerned the infamous "Jenny Jones" case, in which
Jonathan Schmitz was invited to appear on a talk show
and the victim, Scott Amedure, confessed his crush on
Schmitz; three days after the taping of the show,
Schmitz murdered Amedure. Amedure's estate then
brought a civil action against the producers of the talk
show. This Court held that the "defendants owed no
legally cognizable duty to protect plaintiffs' decedent
from the homicidal acts of a third party." *Id*. at 488.
The Court analyzed whether a duty of care existed
under the standards discussed in *MacDonald v PKT,
Inc*, 464 Mich 322; 628 NW2d 33 (2001), which ad-
dressed a merchant's duty to protect business invitees
from the criminal acts of third parties. This Court held
that invitors have "a duty to respond reasonably to
situations occurring on their premises that pose a risk
of imminent and foreseeable harm to identifiable invi-
tees," but "no duty to otherwise anticipate and prevent
the criminal acts of third parties." *Graves*, 253 Mich
App at 495. In concluding that the show's producers
did not owe Amedure a duty of care, the *Graves* Court
determined that there had been no evidence putting

the defendants on notice that Schmitz posed a risk of violence to others. *Id.* at 499.

*Graves* is relevant to the instant case because both the question of duty and proximate cause " 'depend in part on foreseeability.' " *Babula v Robertson*, 212 Mich App 45, 53; 536 NW2d 834 (1995), quoting *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977). "In fact, the question of proximate cause has been characterized as 'a policy question often indistinguishable from the duty question.' " *Babula*, 212 Mich App at 54, quoting *Moning*, 400 Mich at 438.

*Babula*, in which the defendant husband, Brian Robertson, molested the child of the defendant wife's sister while the defendant wife, Janice Robertson, was babysitting the child, is also instructive. *Babula*, 212 Mich App at 46-47. Brian was convicted of second-degree criminal sexual conduct. Later, the plaintiff brought a civil suit against Brian and added a count of negligence against Janice. *Id.* at 47. The trial court granted Janice's motion for summary disposition on the bases that "Janice owed no duty to the child and that alleged negligence attributable to Janice was not the proximate cause of the child's injury." *Id.* at 48. This Court determined that the injuries Brian inflicted "were wholly unforeseeable." *Id.* at 51. Relevant to the instant case was this Court's comment that "[t]he mere fact that Brian was allegedly intoxicated when Janice went to sleep was not sufficient to put her on notice that Brian might injure the child." *Id.* at 53. So, while the issue of proximate cause is ordinarily a question for the trier of fact, the Court determined "that reasonable minds could not differ with regard to whether alleged negligence attributable to Janice was a proximate cause of the child's injury." *Id.* at 54. The Court further held "that Brian's act of molesting the child was an

unforeseeable intervening cause of the child's injury" and affirmed the trial court's grant of summary disposition to Janice. *Id.*

On the other hand, Michigan has "long recognized that criminal acts by third parties can be foreseeable." *Dawe v Dr Reuven Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 394; 808 NW2d 240 (2010). The *Dawe* case was a malpractice action arising out of injuries the plaintiff received in a murderous rampage perpetrated by a former patient (Joseph Brooks) at the defendants' psychiatric office where the plaintiff was being treated. Among the theories the plaintiff asserted was that the defendants had violated a "mental-health professional's common-law duty to warn or protect third parties from dangerous patients." *Id.* at 387. An issue on appeal was proximate cause and whether Brooks's criminal actions were reasonably foreseeable. The Court concluded that because the plaintiff presented evidence from which a reasonable jury could find that the "defendants knew or should have known that Brooks would form improper emotional attachments to persons in his group therapy and that he might seek out those persons long after the termination of his participation in the group," the issue of proximate cause was properly left for the jury to determine. *Id.* at 394-395 (quotation marks omitted).

Seils points to no evidence that would have put the FOPA, Olympia, or anyone else at the Hoedown on notice that Pink would later premeditate and deliberately commit the horrific crimes at issue in this case. Seils instead speaks only of generalities, that it is well known that drinking alcohol can lead to violent behavior. In particular, Seils cites dicta[7] from *Terpening v*

---

[7] "Obiter dicta are not binding precedent. Instead, they are statements that are unnecessary to determine the case at hand and, thus,

*Gillimino, Inc,* unpublished opinion per curiam of the Court of Appeals, issued January 12, 2001 (Docket No. 221275), pp 2-3: "It is foreseeable that furnishing alcohol to an already drunk individual will prompt that individual to display raucous and even violent behavior causing injury to himself and others." While an unpublished opinion of this Court is not precedentially binding under the principle of stare decisis, MCR 7.215(C)(1), it is ironic that the *Terpening* Court determined that the plaintiff in that case had not established proximate cause when "[i]t is not foreseeable that selling a minor a beer would result in plaintiff, a third party, being beaten up at his home later that evening." *Id.* at 2. At any rate, the *Terpening* Court in its dicta was referring to *Weiss*, a dramshop case in which a drunken brawl occurred outside a bar after closing. While an intoxication-fueled assault occurring at or near the dramshop, as in *Weiss*, or an auto accident caused by a drunken driver might be reasonably foreseeable results of "selling, giving, or furnishing of alcoholic liquor to [a] minor or visibly intoxicated person," MCL 436.1801(3), no evidence exists in this case that would have put the FOPA and Olympia on notice that violating the statute would lead Pink to deliberately, and with premeditation, commit the crimes at issue here. See, e.g., *Rogalski v Tavernier*, 208 Mich App 302, 306-307; 527 NW2d 73 (1995) (holding in the context of social-host liability that reasonable minds could not disagree that the criminal acts of the minors were not foreseeable consequences of serving alcohol to underage drinkers). Consequently, we conclude the alleged statutory violation in this case cannot be established as a proximate cause of Seils's

'lack the force of an adjudication.'" *People v Peltola*, 489 Mich 174, 190 n 32; 803 NW2d 140 (2011) (citation omitted).

damages. MCL 436.1801(3); *Graves*, 253 Mich App at 499-500; *Babula*, 212 Mich App at 53-54.

Our conclusion that Seils has failed to present evidence to establish proximate cause is supported by caselaw from other states that the FOPA and Olympia cite regarding whether a dramshop violation could be a proximate cause of the subsequent violent criminal act of an intoxicated person. See *Fast Eddie's v Hall*, 688 NE2d 1270, 1274-1275 (Ind App, 1997) (holding that the dramshop violation was not the proximate cause of a drunken bar patron's sexual assault and murder by another drunken bar patron because the series of events leading to the crimes were not reasonably foreseeable and the AIP's intentional criminal acts were an intervening cause), *Merchants Nat'l Bank v Simrell's Sports Bar & Grill, Inc*, 741 NE2d 383, 389 (Ind App, 2000) (holding that proximate cause was not established when one bar patron shot and killed another bar patron after leaving the bar, which was the "intervening criminal act that broke the causal chain"), *Boggs v Bottomless Pit Cooking Team*, 25 SW3d 818, 825 (Tex App, 2000) (holding that the dramshop violation was not a proximate cause of death when after a minor traffic accident the allegedly intoxicated passenger in one car stabbed and killed the driver of other car; the AIP's criminal actions were not foreseeable), *Reilly v Tiergarten Inc*, 430 Pa Super 10, 15; 633 A2d 208 (1993) (holding that the actions of a teen improperly served who attacked his father and whom police shot were not foreseeable or the natural and probable result of the dramshop violation), and *Skipper v United States*, 1 F3d 349, 353 (CA 5, 1993) (holding under Texas law that first-degree murder committed by an AIP was an unforeseeable, superseding cause extinguishing dramshop liability).

IV. OTHER ISSUES IN DOCKET NO. 316511

Although Olympia's remaining issues could be considered moot[8] given our resolution of the proximate cause issue, we briefly discuss them as an alternative basis for resolving Olympia's appeal. We conclude that both of Olympia's other arguments have merit and would alternatively warrant granting summary disposition to it on Seils's dramshop claim.

A. DRAMSHOP VICARIOUS LIABILITY

Olympia argues that the dramshop act is a remedial statute, requiring that it be strictly construed. The act imposes duties on a "retail licensee" who is the "person" subject to liability under the act. MCL 436.1801(2) and (3); *Guitar v Bieniek*, 402 Mich 152, 166; 262 NW2d 9 (1978). Olympia further argues that the Legislature did not intend "to expand the class of persons who may be vicariously liable" beyond "the narrow and restrictively drawn civil liability provisions" of the act. *Guitar*, 402 Mich at 166-167. Further, because there is no express provision for vicarious liability under the statute, it imposes liability only on the liquor licensee. We agree. This issue presents a question of statutory interpretation, which is reviewed de novo. *Niles Twp v Berrien Co Bd of Comm'rs*, 261 Mich App 308, 312; 683 NW2d 148 (2004).

In rejecting Olympia's argument on this issue, the trial court relied on *Kerry v Turnage*, 154 Mich App 275; 397 NW2d 543 (1986). *Kerry* is distinguishable and not binding precedent. MCR 7.215(J)(1). Moreover,

---

[8] An issue is moot when a judgment, if entered, cannot have any practical legal effect on the existing controversy. *People v Richmond*, 486 Mich 29, 34-35; 782 NW2d 187 (2010), clarified on rehearing with respect to other issues 486 Mich 1041 (2010).

*Kerry* was overruled *sub silentio* by *McGuire v Sanders,* 474 Mich 1098 (2006), rev'g 268 Mich App 719; 708 NW2d 469 (2005). In *McGuire,* 474 Mich at 1098, our Supreme Court reversed this Court's holding in *McGuire,* 268 Mich App at 729, that one licensee (Hamilton Placement) could be found liable under the dramshop act for exerting control over the selling licensee (Leggs Lounge) "through shared managers or employees." Moreover, even it were good law, *Kerry* was decided on the basis that the licensee in that case, a group of athletic boosters, was an alter ego of the school district. In this case, the FOPA and Olympia are separate and distinct legal entities.

The dramshop act does not permit imposition of liability on a third party under a common-law theory of vicarious liability that the third party is the principal and the liquor licensee the agent. Under the dramshop act, the only vicarious liability that exists is for liability flowing upward to the "retail licensee" from its "clerk, agent, or servant" who actually sells, furnishes, or gives "alcoholic liquor to a person who is visibly intoxicated." MCL 436.1801(2). Nothing may be read into a clear statute that is not within the manifest intent of the Legislature as discerned from the language of the statute itself. See *People v Breidenbach,* 489 Mich 1, 10; 798 NW2d 738 (2011).

Moreover, statutes in derogation of the common law are narrowly construed. *Rusinek v Schultz, Snyder & Steele Lumber Co,* 411 Mich 502, 507-508; 309 NW2d 163 (1981). "The general rule at common law was that a tavern owner was not liable for furnishing alcoholic beverages to a customer who became intoxicated and who, as a result of his own intoxication, either injured himself or an innocent third person." *Jackson v PKM Corp,* 430 Mich 262, 266; 422 NW2d 657 (1988). The

*Jackson* Court opined that " 'the Legislature intended the dramshop act to be a complete and self-contained solution to a problem not adequately addressed at common law and the exclusive remedy for any action arising under "dramshop related facts." ' " *Id.* at 274-275, quoting *Millross v Plum Hollow Golf Club*, 429 Mich 178, 185-186; 413 NW2d 17 (1987). Further, the dramshop act provides that it is "the exclusive remedy for money damages against a licensee arising out of the selling, giving, or furnishing of alcoholic liquor to a minor or intoxicated person." MCL 436.1801(10). In sum, the dramshop act is in derogation of the common law, provides the exclusive remedy against a "retail licensee" regarding selling, furnishing, or giving alcoholic beverages to a minor or visibly intoxicated person, and may not be expanded beyond its plain terms by common-law legal theories to reach nonlicensees.

Consequently, we conclude that because Olympia was not the liquor licensee in this case, this argument provides an alternative basis for reversing the trial court and remanding for entry of an order granting summary disposition to Olympia regarding Seils's dramshop claim.

### B. STATUTORY NOTICE

As a second alternative basis for reversing the trial court, Olympia argues that Seils failed to give Olympia timely written notice of its intent to seek damages under the dramshop act as required by MCL 436.1801(4). We agree. This issue also presents a question of statutory interpretation, which is reviewed de novo. *Niles Twp*, 261 Mich App at 312.

MCL 436.1801(4) provides:

An action under this section shall be instituted within 2 years after the injury or death. A plaintiff seeking damages under this section *shall give written notice to* **all defendants** within 120 days after entering an attorney-client relationship for the purpose of pursuing a claim under this section. Failure to give written notice within the time specified *shall be grounds for dismissal of a claim as to* **any defendants** that did not receive that notice unless sufficient information for determining that a retail licensee might be liable under this section was not known and could not reasonably have been known within the 120 days. [Emphasis added.]

The pertinent facts underlying this argument are as follows. On April 11, 2011, Seils entered a contingent-fee agreement with attorney Peter J. Parks to pursue claims for damages against responsible parties concerning the events occurring on or about May 14, 2010. On May 25, 2011, Parks sent Freedom of Information Act requests to the Liquor Control Commission and the city of Detroit requesting information related to the alcoholic beverage concession at the 2010 Hoedown. Parks at some point obtained a copy of the concession agreement between Olympia and the FOPA that stated in its preamble that Olympia had been engaged by CBS Radio and Live Nation to manage food and beverage sales at the 2010 Hoedown at Hart Plaza and that Olympia desired to engage the FOPA to conduct the purchase and sale of alcoholic beverages.

On June 17, 2011, Parks sent a letter to Robert Estabrook of the FOPA, which stated that he intended to pursue a dramshop claim against the FOPA. The letter stated that it was Seils's position that Pink "was clearly visibly intoxicated prior to being furnished intoxicants (beer) by vendors operating under the temporary liquor license issued to the [FOPA] contrary to law." The letter asserted claims of liability under

MCL 436.1801 and stated that the letter was intended to afford the FOPA formal notice under the act of Seils's claims.

On August 9, 2011, Parks sent a letter to Robert Stefanski of Olympia that contained a "courtesy copy" of the letter Parks sent to the FOPA. Parks's letter to Stefanski stated that Parks had not received a reply from the FOPA or its insurance carrier; the letter did not assert a claim under MCL 436.1801 against Olympia. Also, on August 9, 2011, Parks sent to the Clinton Township Police Department and the Roseville Police Department letters identical in content to that sent to Olympia. The trial court ruled that the August 9, 2011 letter to Stefanski, which contained a "courtesy copy" of the notice sent to the FOPA, was sufficient notice to Olympia of Seils's dramshop claim against Olympia.

We conclude that the August 9, 2011 letter Parks sent to Stefanski was by its plain terms merely a "courtesy copy" notice of Seils's intent to pursue a dramshop claim against the FOPA. It cannot, by its plain terms, be read as a notice of a dramshop claim against Olympia. The statute clearly and unambiguously requires written notice to "all defendants," and "any defendants" not timely noticed may move for dismissal. MCL 436.1801(4). Because of this clear language, Seils's agency argument is without merit.

While the statute does not specify what the notice must contain, read in context with the first sentence regarding when "[a]n action" must be brought, it is patent that the written notice must, at a minimum, provide notice to the defendant of the plaintiff's intent to pursue "[a]n action" under the dramshop act against the notified defendant. Parks's August 9, 2011 letter did not do so with respect to Olympia. A plaintiff's "[f]ailure to give written notice within the time speci-

fied shall be grounds for dismissal of a claim as to any defendants that did not receive [the] notice" required by MCL 436.1801(4). To the extent the trial court relied on a finding that Olympia did not show that it had suffered any prejudice, we must conclude that the trial court also erred. See *Chambers v Midland Country Club*, 215 Mich App 573, 578; 546 NW2d 706 (1996); *Lautzenheiser v Jolly Bar & Grille, Inc*, 206 Mich App 67, 70; 520 NW2d 348 (1994).

We therefore conclude that Seils's failure to give Olympia the timely written notice required by MCL 436.1801(4) provides another alternative basis for reversing the trial court's denial of Olympia's motion for summary disposition, and we remand for entry of an order granting summary disposition to Olympia regarding Seils's dramshop claim.

### V. CONCLUSION

For the reasons discussed in this opinion, we affirm the trial court in Docket No. 315891, but in Docket No. 315901 and Docket No. 316511 we reverse the trial court's denial of summary disposition to the defendants on Seils's dramshop complaint. We remand to the trial court for entry of orders in Docket Nos. 315901 and 316511 granting summary disposition to the defendants in those cases and for any further proceedings consistent with this opinion. We do not retain jurisdiction. Defendants, as the prevailing parties in these cases, may tax costs under MCR 7.219.

BOONSTRA, P.J., and MARKEY and K. F. KELLY, JJ., concurred.