# STATE OF MICHIGAN

# COURT OF APPEALS

---

JENNIFER STAMLER, a legally incapacitated
person, by her guardian/conservator, PATRICIA
STAMLER,

        Plaintiff-Appellant,

v

OAKLAND PHYSICIANS MEDICAL CENTER,
LLC, d/b/a DOCTORS HOSPITAL OF
MICHIGAN, ANUJ MITTAL, M.D., and M-
AMIN BADAWI, M.D.,

        Defendants-Appellees,

and

PONTIAC GENERAL HOSPITAL AND
MEDICAL CENTER, d/b/a NORTH OAKLAND
MEDICAL CENTER, and JEETENDER S.
MATHARU, M.D.,

        Defendants.

UNPUBLISHED
March 10, 2016

No. 325261
Oakland Circuit Court
LC No. 2012-128636-NH

---

Before: SAAD, P.J., and SAWYER and HOEKSTRA, JJ.

PER CURIAM.

In this medical malpractice action, the trial court entered a default judgment against defendant Oakland Physicians Medical Center (OPMC). That order constituted a final order.[1] Plaintiff now appeals as of right, challenging two previous orders entered by the trial court which granted summary disposition in favor of defendants Dr. Anuj Mittal and Dr. M-Amin Badawi. Because a factual question remains regarding whether Dr. Mittal's and Dr. Badawi's alleged negligence was a proximate cause of Stamler's injuries, we reverse the trial court's grant of

---

[1] MCR 7.202(1)(6); MCR 7.203(A)(1).

-1-

summary disposition to these defendants and remand for further proceedings consistent with this opinion.

## I. FACTS & PROCEDURAL HISTORY

In December 2009, plaintiff Jennifer Stamler, a legally incapacitated person, was admitted to the psychiatric floor of Doctors Hospital of Michigan (DHM). Stamler had long suffered from schizophrenia, bipolar mood disorder, and various other mental illnesses. Once admitted to DHM, Stamler was placed in the care of Dr. Short, a psychiatrist, and Dr. Mittal, a family medicine practitioner, was Stamler's "medical consultant," meaning that he consulted in the treatment of Stamler's non-psychiatric medical issues as needed.

Shortly after Stamler's admission to DHM, Dr. Short ordered a urinalysis and urine culture when he suspected that Stamler was suffering from a urinary tract infection (UTI). Dr. Short also consulted Dr. Mittal, who started Stamler on Ciprofloxacin ("Cipro"), a broad spectrum antibiotic commonly used to treat UTIs. Notably, the urinalysis and urine culture revealed that Stamler had E. coli in her urine that was resistant to treatment with Cipro. Although the cultures showed the presence of bacteria, because the colony count was too low and Stamler was not experiencing clinical symptoms of a UTI, she was not diagnosed with a UTI. Dr. Mittal discontinued Cipro in December of 2009 because Stamler did not have a UTI.

In January 2010, doctors once again suspected that Stamler was suffering from a UTI. The urinalysis and urine culture conducted at that time again revealed that Cipro-resistant E. coli was present in Stamler's urine. However, because Stamler was not exhibiting clinical symptoms of a UTI, she was not treated with any antibiotic.

On February 11, 2010, Dr. Mittal once again suspected that Stamler had a UTI, given that she had a fever and other symptoms. Dr. Mittal ordered a straight catheter to obtain a urine sample. On February 12, 2010, Stamler showed an elevated temperature and she stated that she was not feeling well. Nurses attempted to contact Dr. Mittal. However, when Dr. Mittal could not be reached, nurses contacted Dr. Badawi, who had not previously seen Stamler. In response to the symptoms described by the nurses over the telephone, and without inquiring about previous urine cultures, Dr. Badawi prescribed Cipro for Stamler.

Within several hours of Stamler's first dose of Cipro, Stamler was visited by Dr. Mittal and another doctor. Both doctors noted a likely UTI. Neither doctor changed Dr. Badawi's prescription for Cipro. Treatment with Cipro continued on February 13 and February 14.

On February 15, 2010, Stamler's health deteriorated rapidly. She was taken to the intensive care unit (ICU) with a diagnosis of septic shock, UTI, urosepsis, and aspiration pneumonia. Following admission to the ICU, Stamler's urine culture was returned showing, once again, Cipro-resistant E. coli. Her UTI and urosepsis were then treated with a range of different antibiotics. Stamler remained in the ICU for two months.

Stamler's sister, as her guardian and conservator, filed the instant malpractice suit, alleging that Dr. Badawi and Dr. Mittal were negligent for attempting to treat Stamler's UTI with Cipro in light of prior tests showing bacteria in Stamler's urine that was resistant to Cipro. Stamler asserted that this permitted the UTI to go untreated and resulted in sepsis and the long

hospital stay. Stamler supported her claim of medical malpractice with the opinion of two expert witnesses: Dr. Stephan Hosea and Dr. Jeffrey Deitch.

Dr. Badawi moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that there was no question of fact regarding causation. Specifically, he argued that he had a very limited role in Stamler's treatment, particularly given Dr. Mittal's subsequent treatment of Stamler. Further, Badawi asserted that Stamler provided only speculative causation evidence insofar as her expert, Dr. Hosea, ignored evidence showing that Stamler's condition improved on February 13, after receiving Cipro. According to Badawi, his very limited role, combined with the speculative causation evidence, required summary disposition in his favor. In response, Stamler argued that there was, at the very least, a question of fact regarding causation that should be left to the jury, and that the expert's testimony was not speculative.

Dr. Mittal later filed his own motion for summary disposition, making nearly identical arguments to Dr. Badawi's—that Stamler's theory of causation was speculative because Stamler showed improvement after being given the Cipro, and other doctors were also involved in the treatment. In response, Stamler argued that the theory of causation was not speculative, that there was a question of fact regarding whether Stamler improved with the Cipro, and that the medical records supported her expert's opinion.

After holding two separate hearings, the trial court granted Dr. Badawi's and Dr. Mittal's respective motions for summary disposition, based on the conclusion that the expert testimony on causation was speculative with respect to each doctors' role in causing Stamler's injuries. In particular, during both hearings, the trial court relied heavily on what the trial court believed to be a fact in evidence—that Stamler had suffered a UTI in December 2009 and treatment with Cipro, despite the urine culture showing Cipro-resistance, worked. Based on its belief that Cipro previously "worked" in the treatment of Stamler's Cipro-resistant UTI, the trial court reasoned that Stamler could not show that Cipro was the cause of her injuries or that a different antibiotic would have prevented sepsis. Thus, the trial court concluded that Stamler had not presented sufficient evidence on the element of causation to survive Dr. Badawi's and Dr. Mittal's respective motions for summary disposition.

After the various other defendants in the case were disposed of, Stamler filed the instant appeal, arguing that the trial court should not have granted summary disposition to either Dr. Badawi or Dr. Mittal based on causation.[2] Stamler contests the assertion that her experts

---

[2] Dr. Badawi asserts on appeal that the trial court's summary disposition order amounted to an order striking plaintiff's expert witness, Dr. Hosea, as an expert. However, the record is plain that there was no motion to strike Dr. Hosea's testimony, the trial court never ordered such evidence stricken, and the only order on review is the order to grant summary disposition based on lack of evidence for causation. Because there was no motion to strike this testimony and the trial court entered no such order, we will not consider this unpreserved question of whether the expert testimony should have been stricken. See *Hines v Volkswagen of Am, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). Indeed, Badawi and Mittal waived this issue by failing to properly raise the matter in the trial court. *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d

-3-

presented speculative testimony. In particular, she contends that the trial court erred by concluding that she benefited from Cipro in December because, in actuality, she did not have a UTI at that time. Regarding the assertion that her condition initially improved in February following treatment with Cipro, Stamler contends that the experts disagree on the interpretation of her symptoms, such that a question remains for the jury. Stamler emphasizes her rapid deterioration on February 15, and she argues that, notwithstanding claims that Cipro "worked", the undisputed facts show that the bacteria were resistant to Cipro and could *not* be treated with Cipro. Finally, Stamler argues that there can be more than one proximate cause of an injury, such that treatment by more than one doctor does not preclude a finding that both Badawi and Mittal are proximate causes of her injuries. Ultimately, given the causation evidence offered by Dr. Hosea and Dr. Deitch, Stamler argues that a fact question remains regarding causation.

## II. STANDARD OF REVIEW

"This Court reviews decisions on motions for summary disposition de novo to determine if the moving party was entitled to judgment as a matter of law." *Alcona Co v Wolverine Environmental Prod, Inc*, 233 Mich App 238, 245; 590 NW2d 586 (1998). A motion for summary disposition under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint." *Joseph v Auto Club Ins Assoc*, 491 Mich 200, 206; 815 NW2d 412 (2012). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Summary disposition is proper where there is no "genuine issue regarding any material fact." *Id*.

## III. ANALYSIS

A plaintiff in a medical malpractice action must establish four elements: "(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Woodard v Custer*, 473 Mich 1, 6; 702 NW2d 522 (2005) (citation omitted). "Generally, expert testimony is required in medical malpractice cases." *Id*. Regarding causation, " '[p]roximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Craig*, 471 Mich at 86. See also MCL 600.2912a(2).

> The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. [*Craig*, 471 Mich at 86-87, quoting *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994).]

---

296 (2004). In any event, as discussed *infra*, there is nothing speculative about Dr. Hosea's opinion and no basis for striking his testimony.

"[I]t is well-established that there can be more than one proximate cause contributing to an injury." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 496; 791 NW2d 853 (2010). Consequently, to establish proximate causation, a plaintiff need not demonstrate that an act or omission was the "*sole* catalyst for his injuries," but he "must introduce evidence permitting the jury to conclude that the act or omission was *a* cause." *Craig*, 471 Mich at 87.

"As a matter of logic, a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Id.* "Normally, the existence of cause in fact is a question for the jury to decide, but if there is no issue of material fact, the question may be decided by the court." *Genna v Jackson*, 286 Mich App 413, 418; 781 NW2d 124 (2009). "Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation." *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009) (citation omitted). A plaintiff must put forth proof that amounts to "a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty." *Skinner*, 445 Mich at 166 (internal quotation and citation omitted). "Summary disposition is not appropriate when the plaintiff offers evidence that shows that it is more likely than not that, but for defendant's conduct, a different result would have obtained." *Robins v Garg (On Remand)*, 276 Mich App 351, 362; 741 NW2d 49 (2007) (citation and quotation marks omitted).

In comparison to a cause in fact, legal or proximate cause "is that which, in a natural and continuous sequence, unbroken by new and independent causes, produces the injury." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 496; 668 NW2d 402 (2003). Thus, consideration of proximate causation requires "an independent, searching inquiry, the focus of which is whether the result of conduct that created a risk of harm and any intervening causes were foreseeable." *Jones v Detroit Med Ctr*, 490 Mich 960; 806 NW2d 304 (2011). "An intervening cause breaks the chain of causation and constitutes a superseding cause which relieves the original actor of liability, unless it is found that the intervening act was 'reasonably foreseeable.'" *Auto Owners Ins Co v Seils*, 310 Mich App 132, 157; 871 NW2d 530 (2015), quoting *McMillian v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985). Negligent medical care in the treatment of an injury is typically considered foreseeable. *Richards v Pierce*, 162 Mich App 308, 317; 412 NW2d 725 (1987). See also *People v Schaefer*, 473 Mich 418, 437; 703 NW2d 774 (2005). Moreover, "[a]n act of negligence does not cease to be a proximate cause of the injury because of an intervening act of negligence, if the prior negligence is still operating and the injury is not different in kind from that which would have resulted from the prior act." *Taylor v Wyeth Labs., Inc*, 139 Mich App 389, 401-402; 362 NW2d 293 (1984). Proximate causation and whether an intervening negligent act constitutes a superseding cause is typically a question for the jury. *Id.* at 402; *Richards*, 162 Mich App at 317.

## A. DR. MITTAL

In this case, as noted, Dr. Badawi initially prescribed Cipro to Stamler on February 12, 2010. Thereafter, Dr. Mittal saw Stamler later that same day and on other occasions, when he could have altered the course of treatment. Instead, Dr. Mittal concurred in Dr. Badawi's prescription, and continued Stamler on Cipro, despite knowing of Stamler's previous urine

cultures showing the presence of Cipro-resistant bacteria in Stamler's system. To establish that Mittal acted negligently in his treatment of Stamler with Cipro, and to establish that this breach of the standard of care caused Stamler's subsequent injuries, Stamler presented expert testimony from Dr. Hosea and Dr. Deitch.

According to these experts, it is a breach of the standard of care to prescribe an antibiotic for an infection if a doctor knows that particular infection is resistant to that antibiotic or when, as in this case, the doctor knows of previous cultures demonstrating the presence of bacteria resistant to the antibiotic in question. As explained by the experts, bacteria resistant to a particular antibiotic becomes part of a person's flora of bacteria, such that it would be highly unlikely a subsequent UTI would be caused by something other than the bacteria found in the previous cultures. For this reason, because Dr. Mittal was aware of the past cultures showing Cipro-resistant bacteria, Stamler's experts opined that he should not have used Cipro in February of 2010 to treat Stamler's UTI. Dr. Hosea and Dr. Deitch identified several alternative medications that should have been used under the circumstances to treat Stamler's UTI.

These experts also testified that Dr. Mittal's improper use of Cipro to treat Stamler in February of 2010 caused her subsequent illness and hospital stay. To begin with, these experts explained the simple proposition that bacteria that are resistant to an antibiotic cannot be treated by that antibiotic. For example, Dr. Hosea specified that if bacteria are resistant to Cipro, Cipro cannot possibly work in the treatment. In Stamler's case in particular, urine cultures conducted in February 2010 confirmed that Stamler's infection was resistant to Cipro, meaning that Cipro could not work as a treatment and thus, given Dr. Mittal's negligence, Stamler's UTI effectively went untreated until she was admitted to the ICU on February 15. Dr. Hosea described in detail how this untreated UTI led to Stamler's sepsis and related issues as follows:

> When the urinary tract infection became symptomatic based on her fever and her tachycardia, that meant that she had a systemic response to this infection. If that systemic response to this infection is not treated, then the systemic response continues such as it caused the kidneys to shut down, the lungs to shut down, the heart cardiovascular system to shut down so that people develop shock requiring powerful medicines to try and restore their circulation, their renal function as well as their respiratory function.

When asked if a different antibiotic would have caused a different outcome, Dr. Hosea stated "it would have definitely altered her outcome." He explained: "[w]ell, she only had systemic inflammatory response syndrome initially and the antibiotics would have treated the infection in her bladder so that she more likely than not would not have gone on to develop septic shock." Dr. Hosea stated specifically that a change in antibiotic up until 24 hours before Stamler's deterioration on February 15, would have made a difference in her outcome, in that she would have avoided septic shock. Dr. Hosea testified that the prescription and continuation of Cipro "more likely than not caused [Stamler's] subsequent complications," including "septic shock, respiratory failure, pulmonary embolism, the aspiration pneumonia, the empyema pneumonia and decortication[.]" Dr. Deitch likewise opined that "if a different antibiotic would have been given, [Stamler] would have not had sepsis."

Considering this testimony, a question of fact clearly remains regarding whether Dr. Mittal constituted a proximate cause of Stamler's injuries. That is, contrary to the trial court's conclusions, Stamler presented expert testimony that Mittal's improper continuation of a course of treatment involving Cipro resulted in Stamler's development of septic shock and an array of other issues. In other words, the chain of causation described by Stamler's experts leads straight from Dr. Mittal's continuation of an inappropriate antibiotic to Stamler's urosepsis and lengthy ICU stay. Because Stamler offered evidence to show that it is more likely than not that, but for Mittal's conduct, a different result would have been obtained, summary disposition was improper. *Robins*, 276 Mich App at 362.

In contrast to this conclusion, Dr. Mittal contends on appeal that summary disposition was appropriate because (1) treatment by other doctors precludes a finding of proximate causation and (2) Stamler's expert testimony was speculative insofar as it ignored facts in evidence, such as Stamler's improvement while taking Cipro. These arguments are without merit. First, there can be more than one proximate cause, *O'Neal*, 487 Mich at 497, and Stamler clearly presented expert testimony to support her position regarding Mittal's proximate role in causing her injury. While this testimony is not dispositive, it is sufficient to raise a question of fact to defeat Mittal's motion for summary disposition.

Second, contrary to Dr. Mittal's arguments and the trial court's findings, Stamler's experts did not ignore facts in evidence and we see nothing speculative in their expert opinions. When offering an opinion, experts may not make assumptions that are not in accord with established facts; but, experts are free to disagree regarding the "interpretation" of the facts presented. *Robins*, 276 Mich App at 363. Such disagreement among experts evinces a question for the jury which should not be resolved by the trial court incident to a motion for summary disposition. *Id.* See also *Lenawee Co v Wagley*, 301 Mich App 134, 166; 836 NW2d 193 (2013) ("Disagreements pertaining to an expert witness's interpretation of the facts are relevant to the weight of that testimony and not its admissibility."). Consequently, in this case, given the opinions of Stamler's experts, the trial court erred by concluding as a factual matter that Stamler previously benefited from Cipro in December of 2009, such that it could not be the cause of her injuries in February of 2010. In reaching this conclusion, the trial court disregarded the testimony of Stamler's experts, resolved factual questions of causation, and failed to view the record in a light most favorable to Stamler.[3] Likewise, insofar as Mittal argues that Cipro cannot be a cause of Stamler's injuries because she initially improved on Cipro in February, this argument ignores Stamler's expert testimony and fails to view the record in a light most favorable to Stamler. To the extent there was debate among the doctors regarding the propriety and efficacy of Cipro for Stamler's treatment in February 2010, this issue was one of fact for the

---

[3] Indeed, as Stamler emphasizes on appeal, there was no factual support at all for the trial court's conclusion that Stamler benefited from Cipro in December. In actuality, it is undisputed that doctors ceased treatment with Cipro in December of 2009, not because it "worked," but because Stamler did *not* have a UTI at that time.

jury.[4]  See *Robins*, 276 Mich App at 363.  Mittal is free to present opposing evidence at trial and to disagree with Stamler's experts' interpretation of the facts, but such disagreement at the summary disposition stage merely evinces the existence of a material question of fact.  See *id.*; *Lenawee Co*, 301 Mich App at 166.  Because a question of fact remained regarding proximate causation, the trial court erred by granting summary disposition to Mittal.

## B.  DR. BADAWI

With regard to Dr. Badawi, as noted, Dr. Badawi initially prescribed Cipro for Stamler on February 12.  At that time, Dr. Badawi failed to inquire about possible past urine cultures, which were part of Stamler's medical record and which would have showed the presence of Cipro-resistant bacteria in Stamler's urine.  Dr. Hosea opined that Dr. Badawi breached the standard of care by prescribing Cipro without inquiring about possible cultures before prescribing an antibiotic.  As discussed above, Dr. Hosea also opined that treatment with Cipro in Stamler's case violated the standard of care given the past tests showing the presence of Cipro-resistant bacteria in Stamler's urine and the high likelihood that her UTI in February would have resulted from the same bacteria.  As discussed in more detail *supra*, according to Dr. Hosea's expert opinion, as a result of the improper treatment with Cipro, which could not work to treat Stamler's Cipro-resistant infection, Stamler's UTI went untreated and this untreated UTI resulted in sepsis and a host of other issues.  Given Dr. Hosea's expert opinion, the trial court erred by granting summary disposition to Dr. Badawi because Stamler offered evidence to show that it is more likely than not that, but for Dr. Badawi's negligent prescription of Cipro, a different result would have been obtained.  See *Robins*, 276 Mich App at 362.

Like Dr. Mittal, Dr. Badawi argues on appeal that summary disposition was appropriate because (1) Dr. Hosea's expert testimony was speculative insofar as it ignored established facts, and (2) treatment by other doctors precludes a finding that Dr. Badawi's prescription of Cipro proximately caused Stamler's injuries.  These arguments lack merit.  First, as with Dr. Mittal's arguments, Dr. Badawi's assertion that Dr. Hosea provided speculative testimony simply because he disagrees with Badawi's interpretation of the facts is without merit for the reasons discussed *supra*.  Certainly there is disagreement among the doctors, but this disagreement merely

---

[4] Specifically, Mittal emphasizes that there is evidence that, on February 13 and 14, Stamler's temperature dropped and she subjectively reported feeling better.  However, the import of these facts is a question in dispute among the experts.  That is, while Mittal claims that these facts demonstrate that Stamler benefited from Cipro, Dr. Hosea testified that a patient's illness may vary from one day to another, regardless of treatment, that people have naturally lower temperatures in the mornings, and that Stamler's subjective reports of good health should be taken lightly considering her volatile mental state.  Moreover, notwithstanding any purported improvement, the facts show that Stamler rapidly deteriorated on February 15 and Dr. Hosea opined that Cipro could not treat a Cipro-resistant bacteria.  In short, Dr. Mittal's interpretation of Stamler's symptoms does not entitle him to summary disposition given Stamler's expert testimony on causation.  See *Robins*, 276 Mich App at 363.

establishes the existence of a fact question for the jury.  See *Robins*, 276 Mich App at 363; *Lenawee Co*, 301 Mich App at 166.

Second, with regard to treatment by other doctors, Dr. Badawi's argument ignores the basic principle that there can be more than one proximate cause of an injury.  *O'Neal*, 487 Mich at 497.  Other doctors may have also treated Stamler, but the fact nonetheless remains that Stamler presented expert testimony to support the proposition that, but for Badawi's alleged negligence, Stamler's injuries would have been avoided.  Indeed, to the extent Dr. Badawi emphasizes that Dr. Mittal's negligent failure to discontinue Cipro came *after* Dr. Badawi's negligent prescription of Cipro, a question of fact remains for the jury regarding whether Mittal's negligence should be seen as a superseding cause.  See *Taylor*, 139 Mich App at 401-402.  That is, negligent medical treatment is typically considered foreseeable, *Richards*, 162 Mich App at 317, and reasonably foreseeable negligence does not relieve an actor of responsibility, *Auto Owners Ins Co*, 310 Mich App at 157.  Viewing the record in a light most favorable to Stamler, reasonable minds could conclude that Dr. Mittal's negligence in failing to modify Dr. Badawi's improper Cipro prescription was foreseeable, meaning that a question of fact remains for the jury regarding whether Mittal's negligence should be seen as a superseding cause.  See *Taylor*, 139 Mich App at 401-402.  Thus, the trial court erred by granting summary disposition to Badawi based on the issue of causation.

Reversed and remanded for further proceedings.  Plaintiff being the prevailing party, may tax costs pursuant to MCR 7.219.  We do not retain jurisdiction.

/s/ Henry William Saad
/s/ David H. Sawyer
/s/ Joel P. Hoekstra

-9-