# STATE OF MICHIGAN

# COURT OF APPEALS

---

HEATHER HEDSTROM,

      Plaintiff-Appellant,

v

COMPASS PROPERTIES, LLC, LEONARD
ZUCKERMAN, RAFID YOUSIF, JOSEPH
MASHNI, YUELIN XU, GREGORY
MESSENGER, and DAVIS JOHNSON,

      Defendants,

and

CENTIS HEALTH, PC, CHRISTOPHER J.
ABOOD, DAVID CORTEVILLE, TIMOTHY M.
HEILMAN, CHARLES H. BILL, MOHAMED H.
ELNABITY, and COMPASS HEALTHCARE,
PLC,

      Defendants-Appellees.

UNPUBLISHED
December 19, 2017


No. 334305
Ingham Circuit Court
LC No. 15-000567-CD

---

Before: MURPHY, P.J., and KELLY and SWARTZLE, JJ.

PER CURIAM.

Plaintiff appeals as of right the August 1, 2016 order granting summary disposition to defendants under MCR 2.116(C)(10) in this action alleging gender and marital-status discrimination under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*., and breach of an employment contract. In the same order, the trial court denied plaintiff's motion to amend her complaint. We affirm.

## I. BACKGROUND

Plaintiff is a neurosurgeon. Defendant Centis Health, P.C. (Centis), also known as Lansing Neurological Associates, was an adult and pediatric neurosurgery practice formed in 2007 by defendant neurosurgeons Charles H. Bill, Christopher J. Abood, and Timothy M.

-1-

Heilman. Defendant neurosurgeon Mohamed H. Elnabtity subsequently joined the practice in 2007.

In November 2007, plaintiff signed a one-year employment agreement with Centis and began performing neurology services for Centis's patients. Plaintiff signed employment agreements with Centis periodically between November 2007 and November 2010 and worked as an employee for Centis during that time. In November 2010, plaintiff was invited to become a physician-shareholder in Centis, purchased 200 shares of Centis stock, and became an equal shareholder in Centis. From November 2010 until early 2011, plaintiff continued to provide neurological services on behalf of Centis but did not sign any employment agreements.

In 2011, plaintiff, the other Centis neurosurgeons, and several other urology and dermatology physicians formed a new entity, defendant Compass Healthcare, PLC (Compass). Plaintiff and the other founding members of Compass executed an operating agreement in 2011 and executed an amended operating agreement in 2013. As of March 2014, the Compass members practice medicine only under the Compass name, and Centis no longer provides medical services.

Under the operating agreement, plaintiff was designated an "A Member" "who share[d] in the net profits or net losses" of the company. Plaintiff was also designated a "B Member" of the neurology specialty division. The operating agreement further contains several provisions related to "B Physicians," which are defined as physicians who are "not a B member and [are] employed as a physician to practice in any Specialty Division." The Compass operating agreement also prohibited members from being employed by an entity competing with Compass's business.

Over the next year, defendants became increasingly concerned about plaintiff's performance and the risks plaintiff posed to patients and the reputation of Compass's practice. Specifically, in the summer of 2014, plaintiff allegedly performed an elective spinal fusion on an elderly patient who later died due to a complication. Defendants believed that the patient's complex medical history made him a poor candidate for surgery. Additionally, around this time, plaintiff allegedly delayed performing surgery on a different patient, and that delay resulted in the patient's paralysis. Because of these concerns, defendant Abood asked Corteville, Compass's Chief Executive Officer, to commission a review of patient files of all five of Compass's neurosurgeons.

Two nurses reviewed patients' files from June 2013 to June 2014 for readmissions from surgery, returns to surgery, post-operative complications, and post-operative infections. Plaintiff had the highest rates of readmissions from surgery, post-operative complications, and post-operative infections of any of the five neurosurgeons. Moreover, plaintiff's post-operative complication rate was nearly eight percent higher than the second-highest rate and plaintiff's post-operative infection rate was more than six percent higher than the second-highest rate. At a board meeting of the neurology division of Compass on May 21, 2015, defendants Abood, Heilman, and Elnabtity agreed to recommend to the Compass Board of Directors that plaintiff's membership interest in Compass be terminated. The members of Compass made the final decision to expel plaintiff from Compass and, on June 1, 2015, plaintiff was notified of her expulsion.

Plaintiff sued defendants on July 10, 2015, alleging claims of gender and marital-status discrimination in violation of the ELCRA against defendants, a breach of contract claim against Centis, and a claim for an accounting against Centis and Compass. As originally pled, plaintiff's complaint also contained a breach-of-contract claim against Compass; however, plaintiff dropped that claim in her amended complaint after the parties agreed to arbitration on the Compass breach-of-contract claim.

Defendants moved for summary disposition on each of the claims on July 27, 2016. Defendants argued that, although plaintiff was an employee of Centis from 2007 until 2010, plaintiff became a member of Centis in 2010 and was therefore not an employee of either Centis or the later-created Compass. Moreover, defendants argued that plaintiff's poor performance meant that she was not similarly situated to the other physicians and could not maintain a claim of employment discrimination. Regarding plaintiff's breach-of-contract claim, defendants argued that plaintiff's employment contract with Centis was terminated when she became a member of Centis and later a member of Compass. Lastly, defendants argued that the claim for an accounting should be dismissed because plaintiff received all of the information she requested during discovery and failed to identify with specificity any additional information still sought to justify an accounting.

Plaintiff generally disagreed with defendants' characterization of the work arrangement and cited several statements of her fellow physicians as evidence of her colleagues' discriminatory intent. Specifically, plaintiff alleged that defendant Bill, a fellow Compass neurosurgeon, referred to patients as "big Michigan Women" and that defendant Elnabtity, also a Compass neurosurgeon, referred to a female employee as "hot." Plaintiff alleged that Dr. Corteville, the now-CEO of Compass, asked plaintiff's then-husband during plaintiff's interview process in 2007 or 2008, whether plaintiff would be having any additional children. Additionally, plaintiff alleged that defendant Abood, another fellow Compass neurosurgeon, told her that the neurosurgeons thought the timing of her expulsion was perfect because plaintiff had recently been divorced and she could use that as a reason for her departure. Defendant Abood testified in his deposition that plaintiff asked him how Compass would explain plaintiff's departure and that Defendant Abood told plaintiff that Compass would say whatever she wanted, including that she left for personal reasons following her divorce if that was what plaintiff wanted them to say Plaintiff also moved to add to her complaint a public-accommodation claim under the ELCRA, arguing that defendants' expulsion of plaintiff denied her the full and equal enjoyment of the accommodations she enjoyed as an employee and owner of Compass.

At a hearing on July 20, 2016, the trial court concluded that there was no genuine issue of fact that plaintiff was not working under the Centis employment agreement at the relevant time and, therefore, was not an employee subject to ELCRA. The trial court reasoned that the Centis employment contract ceased upon execution of the Compass operating agreement and that, at that point, plaintiff became a member operating Compass rather than an employee of Compass. Further, the trial court found that plaintiff's poor performance record meant that plaintiff was not similarly situated to the other physicians in the practice. Accordingly, the trial court granted summary disposition to defendants on the discrimination claims and denied plaintiff's motion to add a public-accommodation claim. The trial court found that the Centis employment agreement was voided by the Compass operating agreement and could not support a claim for breach of

contract and dismissed plaintiff's accounting claim because there was no longer a breach of contract claim against Compass. Plaintiff now appeals as of right.

## II. ANALYSIS

This Court reviews de novo a trial court's decision on a motion for summary disposition under MCR 2.116(C)(10). *Hill v Sears, Roebuck and Co*, 492 Mich 651, 659; 822 NW2d 190 (2012). "Summary disposition is proper if the evidence, affidavits, pleadings, and admissions viewed in a light most favorable to the other party demonstrate that there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015).

### A.     <u>Plaintiff's Discrimination Claims and Motion to Amend Her Complaint</u>

Under the ELCRA, an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." MCL 37.2202(1)(a). Additionally, the ELCRA prohibits any person from denying an individual "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status." MCL 37.2302(a).

In a discrimination action based on disparate treatment, the plaintiff has the initial burden of establishing a prima-facie case of illegal discrimination. *Hazle v Ford Motor Co*, 464 Mich 456, 462-463; 628 NW2d 515 (2001). To establish a prima-facie case of disparate-treatment discrimination, a plaintiff must prove by a preponderance of the evidence that (1) she was a member of the protected class; (2) she suffered an adverse action; (3) she was qualified for the position; and (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct. *Town v Mich Bell Tel Co*, 455 Mich 688, 695; 568 NW2d 64 (1997).

If a plaintiff establishes a prima-facie case, then a presumption of discrimination arises, and the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory justification" for the decision. *Lytle v Malady (On Rehearing)*, 458 Mich 153, 174; 579 NW2d 906 (1998). If the defendant is able to articulate a nondiscriminatory justification for the decision, then the burden shifts back to the plaintiff to show there was a triable issue that the defendants' proffered reasons were not true reasons, but were a mere pretext for discrimination. *Id.*

*Plaintiff Was Not Similarly Situated to Her Peers.* To demonstrate that another person is similarly situated, a plaintiff must prove that "all of the relevant aspects" of her situation were "nearly identical" to those of his situation. *Town*, 455 Mich at 699-700 (internal citation and quotation marks omitted). Pre-lawsuit, defendants performed an extensive review of the performance of each of Compass's five neurologists. Plaintiff's substantially poorer performance than her peers renders her unable to meet her burden to show that she was similarly situated to the other neurologists at Compass. Because plaintiff failed to establish a prima-facie

case of discrimination, the trial court was required to dismiss her claims of gender and marital status discrimination. *Id*. at 699-701.

Even had plaintiff established a prima-facie case, plaintiff's poor performance review constitutes a legitimate, non-discriminatory justification for plaintiff's expulsion from Compass. Plaintiff responds that defendants' claim of poor performance was a mere pretext for discrimination. According to plaintiff, her performance issues were easily explainable, and physicians that were not terminated also had performance issues. Yet, the record indicates that the other physicians' performance issues were not as drastic as plaintiffs. Particularly concerning is plaintiff's high rate of post-operative complications and post-operative infections. Moreover, to the extent that plaintiff seeks to rationalize her poor performance measures, while the explanation may vindicate plaintiff as a quality physician and show that defendants' decision to terminate plaintiff was mistaken, it does not demonstrate a pretext for discrimination.

Plaintiff also points to several comments made by her fellow neurosurgeons that she claims evidence discrimination. While we find that some of the comments were improper, we agree with the trial court that these comments do not support an inference of discrimination. The comments were either isolated, not directed at plaintiff, or temporally removed from plaintiff's expulsion. For instance, plaintiff has not provided a sufficient causal connection between her expulsion and defendant Bill's alleged references to "big Michigan women" and defendant Elnabtity's alleged references to female employees as "hot." While these comments were improper, they do not concern plaintiff or indicate that either defendant wanted her removed because she was a woman. Additionally, Dr. Corteville's improper questioning of plaintiff's then-husband as to whether plaintiff would have more children occurred during plaintiff's interview process in 2007 or 2008 and does not support an inference that plaintiff was fired some seven years later because she was a woman or because she was divorced.

Finally, plaintiff points this Court to defendant Abood's comment that Compass personnel could inform plaintiff's patients that plaintiff voluntarily decided to leave the practice because she was newly divorced and wanted additional time with her kids as evidence of marital-status discrimination. Plaintiff, however, takes this statement out of context. The statement was made in response to plaintiff's questioning as to what her patients would be told if they asked to see plaintiff. When taken in context, the response is clearly an attempt to help plaintiff "save face" with her client base rather than evidence of defendants' discriminatory intent.

Without belaboring the issue with further examples, we conclude, as the trial court did, that plaintiff failed to provide evidence of defendants' discriminatory intent sufficient to rebut defendants' evidence of a non-discriminatory purpose. We conclude that summary disposition was properly granted on plaintiff's claims of gender and marital-status discrimination.

*The Trial Court Properly Denied Plaintiff's Motion to Add a Public-Accomodation Claim.* Although motions to amend a complaint "are generally granted," futility is a proper basis for denial. *Diem v Sallie Mae Home Loans, Inc*, 307 Mich App 204, 216; 859 NW2d 238 (2014). In order to state a claim under MCL 37.2302(a), plaintiff must establish that she was discriminated on the basis of a protected characteristic. *Haynes v Neshewat*, 477 Mich 29, 25; 729 NW2d 488 (2007). Because plaintiff was not similarly situated to her peer neurosurgeons and cannot show that her poor performance review was a pretext for unlawful discrimination,

adding a public-accommodation claim would have been futile. The trial court properly dismissed plaintiff's motion to amend her complaint.

B.    Plaintiff's Breach-of-Contract and Accounting Claims

Plaintiff argues that the trial court erred in dismissing her claim for breach of contract as to Centis. Plaitniff argues that the Compass operating agreement expressly contemplated that physicians would have employment contracts and that, therefore, plaintiff's employment contract with Centis remained enforceable after Compass was formed. We disagree.

As evidence of the viability of her employment agreement with Centis, plaintiff cites provisions in the Compass operating agreement relating to "new B physicians." The Compass operating agreement, however, defines a a "B Physician" as "a physician who is not a B Member and is employed as a physician to practice in any Specialty Division." Because plaintiff was a B Member of Compass, plaintiff therefore could not be a "B Physician" and any provisions applicable to B Physicians were not applicable to plaintiff.

Additionally, plaintiff argues that the Centis employment agreement required termination of that agreement to be in writing. The Compass operating agreement prohibited members from being employed by an entity competing with Compass's business. It is clear that Centis, as a provider of neurology services in the same geographic area as Compass, would compete with Compass's business if it were still providing medical services. Thus, under the two contracts, plaintiff could not be employed simultaneously by Centis and Compass. Noting that the Centis neurosurgeons were the founding members of Compass, we therefore conclude that the Compass operating agreement provides conclusive, written evidence of the parties' intent to terminate the Centis employment agreement. Accordingly, the trial court properly granted summary disposition to defendants on plaintiff's breach-of-contract claim.

Because we conclude that the trial court properly dismissed plaintiff's breach-of-contract claim, we also conclude that the trial court properly dismissed plaintiff's accounting claim. An accounting is an equitable remedy which determines the amount due to a party. *Basinger v Provident Life & Accident Ins Co*, 67 Mich App 1, 7; 239 NW2d 735 (1976). Because plaintiff is not entitled to any damages for breach of the employment agreement with Centis and any breach of an agreement with Compass was not part of the trial-court proceedings, plaintiff has not shown that any amount is due her. Accordingly, there is nothing for which to account.

Affirmed.

/s/ William B. Murphy
/s/ Michael J. Kelly
/s/ Brock A. Swartzle